**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

REILIES WAYNE MILLER,

      Petitioner,

v.                              Case No. 8:17-cv-1595-T-33AEP

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## <u>ORDER</u>

Reilies Wayne Miller, a Florida inmate, timely filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging his Sarasota County convictions. (Doc. 1). Respondent filed a response (Doc. 10) and Miller filed a reply (Doc. 17). Upon consideration, the petition is DENIED.

### Procedural History

Miller was convicted after a jury trial of first degree murder and grand theft motor vehicle. (Doc. 12, Ex. 1, p. 195). The state trial court sentenced him to life in prison. (Doc. 12, Ex. 1a, pp. 344-47). The state appellate court *per curiam* affirmed the convictions and sentences. (Doc. 12, Ex. 4). The state appellate court denied Miller's petition alleging ineffective assistance of appellate counsel, filed under Florida Rule of Appellate Procedure 9.141(d). (Doc. 12, Exs. 13, 14). Miller's motion for postconviction relief filed under Florida Rule of Criminal Procedure 3.850 was denied. (Doc. 12, Exs. 15, 16, 16a). The state appellate court *per curiam* affirmed the denial of relief. (Doc. 12, Ex. 20).

**Facts**[1]

Miller and his sister, Alicia Miller ("Alicia"), used and sold pain killers. Miller and Alicia obtained pills in part through Miller's prescriptions for Roxicodone and Oxycontin. On the night of April 15, 2010, Miller and Alicia wanted more pills but needed money. Joseph Hickey, whom they had met once before, had called Alicia looking for pills. Miller and Alicia decided to lure Hickey into meeting with them by telling him that they had pills for sale, and then to rob him. They agreed that it might become necessary to shoot Hickey during the robbery if anything went wrong.

Alicia and Hickey had phone contact several times on the night of April 15 into the morning of April 16. During this time, Miller and Alicia stole a panel van. Alicia drove the van to pick up Hickey at the arranged meeting site at about 6:00 a.m. on April 16. Miller rode in the front passenger's seat. After Hickey entered through the rear passenger's side sliding door, Miller turned in his seat and shot Hickey.

Alicia continued driving for a time before parking in a vacant waterfront lot. She and Miller exited the van. Miller apparently shifted the van into drive and weighted down the gas pedal, causing the van to lurch forward. It came to rest hanging over a sea wall. Alicia, thinking that they "were leaving Joe Hickey there suffering," refused to leave the scene. (Doc. 12, Ex. 1e, p. 612). Miller returned to the van. After he shot inside the van several times, he and Alicia fled on foot.

After Miller's arrest, he initially denied involvement. However, he then told police that Hickey "pulled a knife" and "dove on" him, resulting in a struggle during in the back of

---

[1] The factual summary is based on the trial transcript and appellate briefs.

the van during which Hickey "went for the gun" and the gun accidentally discharged several times. (Doc. 12, Ex. 1d, pp. 477, 487, 489). Miller told police that he disassembled the gun and threw pieces of it in a lake and a dumpster. Miller stated that he took Hickey's knife from the van and threw it into a lake.

Hickey was shot four times. The medical examiner determined that the fatal wound was a gunshot to the right side of Hickey's head.

## Standard Of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000). A decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case." *Id.* at 413.

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. *See also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court denied Miller's petition alleging ineffective assistance of counsel and affirmed the denial of postconviction relief without discussion. This decision warrants deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). *See also Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S.Ct. 1188, 1192 (2018).

**Exhaustion Of State Court Remedies; Procedural Default**

A federal habeas petitioner must exhaust his claims for relief by raising them in state court before presenting them in his petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition.").

The requirement of exhausting state remedies as a prerequisite to federal review is satisfied if the petitioner "fairly presents" his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). "If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001).

**Discussion**

Ground One

Miller argues that the trial court erroneously gave a "stand your ground" jury instruction. Because Miller has not alleged a federal constitutional violation, his claim is not cognizable in this federal habeas proceeding. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988) ("[A] habeas petition grounded on issues of state law provides no basis for habeas relief."). Further, any federal claim that could be construed from his argument is unexhausted because Miller's appellate challenge to the jury instructions relied solely on state law. (Doc. 12, Ex. 2, pp. 13-16). *See Pearson v. Sec'y, Dep't of Corr.*, 273 Fed. App'x 847, 849-50 (11th Cir. 2008) ("The exhaustion doctrine requires the petitioner to 'fairly present' his federal claims to the state courts in a manner to alert them that the ruling

under review violated a federal constitutional right."); *Zeigler v. Crosby*, 345 F.3d 1300, 1307 (11th Cir. 2003) ("To present a federal constitutional claim properly in state court, 'the petitioner must make the state court aware that the claims asserted present federal constitutional issues.'" (quoting *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998))).

In his reply, Miller appears to argue that he exhausted a federal claim by citing two state decisions, *Dorsey v. State*, 74 So.3d 521 (Fla. 4th DCA 2011), and *Newman v. State*, 976 So.2d 76 (Fla. 4th DCA 2008). He alleges that these decisions "establish the claim as a deprivation of a constitution[al] right." (Doc. 17, p. 4). However, neither decision involves federal constitutional issues. *See id.* And a state prisoner does not fairly present a federal claim to a state court "if that court must read beyond a petition or a brief . . . that does not alert it to the presence of a federal claim." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). Accordingly, Miller did not exhaust a federal claim concerning the jury instructions.

State procedural rules do not provide for successive direct appeals. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within 30 days of the rendition of a sentence). Because Miller therefore cannot return to state court to present a federal claim, his ground is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Miller has not argued or established that either the cause and prejudice exception or the fundamental miscarriage of justice exception applies to overcome the default. Ground One is therefore barred from review.

<u>Ground Two Through Eight: Ineffective Assistance Of Counsel</u>

The rest of Miller's claims allege ineffective assistance of counsel. Claims of ineffective assistance are analyzed under the test set forth in *Strickland v. Washington*, 466

U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id.* at 687. To show deficient performance, Miller must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. A court must consider whether, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Miller must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691-92. He must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The *Strickland* standard applies to claims of ineffective assistance of trial counsel and appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991). To show deficient performance of appellate counsel, Miller must show that appellate counsel's failure to identify and raise a non-frivolous issue was an objectively unreasonable performance. *Robbins*, 528 U.S. at 285-86. To show prejudice, Miller must show a reasonable probability that, but for counsel's unreasonable failure, he would have prevailed on appeal. *Id.*

Obtaining relief on a claim of ineffective assistance of counsel is difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when

the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). *See also Cullen v. Pinholster*, 563 U.S. 170, 202 (2011) (a petitioner must overcome the "'doubly deferential' standard of *Strickland* and AEDPA.").

Ground Two

Miller contends that appellate counsel was ineffective in failing to argue that the trial court abused its discretion when it refused to allow the defense's expert witness to testify, resulting in a due process violation. The state appellate court rejected this claim without discussion when it denied Miller's petition alleging ineffective assistance of appellate counsel.

Whether testimony is admissible concerns the application of Florida evidentiary law. By denying Miller's petition, the state appellate court determined what would have happened had appellate counsel raised this state law claim. This Court must defer to the state appellate court's underlying determination of Florida law. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005) ("The Florida Supreme Court has already told us how the issues would have been resolved under Florida state law had [counsel] done what [Petitioner] argues he should have done . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'" (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997))). *See also Will v. Sec'y, Dep't of Corr.*, 278 Fed. App'x 902, 908 (11th Cir. 2008) ("Although an ineffective-assistance-of-counsel claim is a *federal* constitutional claim, which we consider in light of the clearly established rules of *Strickland*, when 'the validity of the claim that [counsel] failed to assert is clearly a question of *state* law, . . . we must defer to the state's construction of its own law.'" (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291

(11th Cir. 1984))). Miller has not shown that the state appellate court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim. He is not entitled to relief on Ground Two.

Ground Three

Miller contended that Hickey was experiencing drug withdrawal and that it caused Hickey to act aggressively and attack him. Before trial, the State moved to exclude evidence about Hickey's alleged drug withdrawal. In ruling on the motion, the trial court indicated that Miller could present evidence "should a proper predicate be laid and relevance established." (Doc. 12, Ex. 1, p. 191). Miller claims that his testimony would have laid a foundation to allow the defense to call three witnesses: Dr. Goldberger, Carol Springer, and Don Atkins. Miller claims that counsel misadvised him that he did not need to testify in order for the witnesses to be called and led him to believe "that testimony of states witnesses alone was enough to lay a foundation for expert and other defense witnesses." (Doc. 1, p. 8). He also argues that his testimony would have contradicted Alicia's testimony, which incriminated him in the murder.

Miller proffered Dr. Goldberger's testimony to support his theory that Hickey "was using pills, he was out, and he was desperately seeking and persistently seeking pills." (Doc. 12, Ex. 1f, p. 767). Dr. Goldberger testified that Hickey's blood and urine tested positive for oxycodone. (Doc. 12, Ex. 1e, p. 751). Dr. Goldberger opined that making multiple phone calls during the night and agreeing to meet for drugs at 6:00 a.m. was activity consistent with drug withdrawal, and that in addition to displaying such drug-seeking activity, a person experiencing withdrawal may become irritable or unpredictable in his behavior. (*Id.*, pp. 752-53). But Dr. Goldberger conceded that he did not know whether

Hickey was an addict or was suffering from withdrawal at the time of his death. (*Id.*, pp. 754, 756).

The State objected to Dr. Goldberger's testifying before the jury. The State asserted that since there was no evidence that Hickey was an addict, or that Hickey was seeking drugs because he needed them to overcome withdrawal symptoms, Dr. Goldberger's testimony was impermissibly speculative. (*Id.*, p. 758, 760; Ex. 1f, pp. 761, 763). The trial court agreed, concluding that there was no "sufficient basis to support the introduction of his testimony" but noting that Dr. Goldberger could "potentially sit in if the defendant were to testify" to such information. (Doc. 12, Ex. 1f, p. 768).

Miller wanted to call Springer and Atkins in connection with the knife he claims Hickey carried. Miller told police that he took Hickey's knife and threw it in a lake, but no evidence at trial indicated that a knife was ever recovered. Miller asserted that when he was in jail awaiting trial, he told Springer where to look for the knife. (Doc. 12, Ex. 1e, p. 727). Miller contended that Springer and Atkins could testify about why Springer's search for Hickey's knife was unsuccessful. Counsel addressed this proposed testimony with the trial court:

> [COUNSEL]: [Carol Springer] was described a knife and locations to look for the knife. She conducted a search for the knife in the canals along Gulf Gate, finding lots of discarded metal but no knife; went to the maintenance people, and they said, Well, given the time that you're now searching for the knife - - the knife could have been discarded in April. It was December when the information was given up, that it was a wet, rainy season, and the knife would have been washed down and buried under soot.
>
> THE COURT: She won't be able to testify to what was told to her. Is that what you would be offering Mr. Atkins for?
>
> [COUNSEL]: Yes.

THE COURT: And he maintains canals.  I saw his deposition on file.

[COUNSEL]: Yes.

THE COURT: So they would be presented together only for looking for the knife and a potential hypothesis as to why the knife could not be located?

[COUNSEL]: Correct.

(*Id.*, pp. 726-27).

The State objected to the presentation of these witnesses if Miller did not testify. (*Id.*, pp. 727-29).  After Miller decided not to testify, counsel informed the court that the defense would not call Springer or Atkins.  (Doc. 12, Ex. 1f, pp. 769, 771).  Counsel further agreed that "that foundation is needed to be laid by Mr. Miller testifying."  (*Id.*, p. 770).

The state court denied Miller's claim that counsel misadvised him not to testify:

Defendant's first allegation is based on the State's Motion in Limine.  In short, the defense could bring in testimony regarding the victim's alleged drug addiction (and consequently, Defendant's self-defense theory that the victim attacked him because he was in withdrawal) *only* if there was a proper foundation for the proposed evidence.  Defendant sought to include testimony from three witnesses. Defendant alleges that counsel advised him he did not need to testify because the State's witnesses laid the foundation to get the evidence in for the defense.  The Court heard the proffered testimony for those three witnesses and ruled the testimony was not admissible.  The Court could not determine whether Defendant's testimony would have laid the necessary predicate for the witnesses because Defendant did not testify.  Defendant believes his own testimony would have laid the necessary foundation and his attorney prejudiced him by misadvising him.

Defendant indicated in his motion he would have testified consistently with his statement to law enforcement.  Specifically, Defendant maintains that: (1) he did not attempt to rob the victim, (2) he only intended to sell the victim pills, (3) he had the gun for protection because the time of day for the sale was unusual, (4) the victim attacked him and he shot the victim during that struggle, and (5) he only lied, at first, to the Detective out of fear.  All of these statements were already in evidence (except Defendant's justification for lying) via law enforcement's videotaped conversation with him.  Defense counsel argued that Defendant's videotaped statement to law enforcement

shows Defendant thought something was off about the drug deal due to the time of day and apparent urgency of it. Therefore, the defense argued, the doctor's testimony about drug addiction and withdrawal would show the reasonableness of Defendant's state of mind going into the situation.

However, Defendant's allegations that his testimony would have made a difference are refuted by the record, and Defendant has failed to show prejudice. There were three witnesses at issue: Dr. Goldberger, Carol Springer, and Don A[t]kins. Dr. Goldberger would have testified in support of the defense that the victim was in drug withdrawal. Carol Springer and Don A[t]kins would have testified about a search for a knife they conducted based on Defendant's information, and they would give potential reasons why the knife could not be located.

As Ms. Springer['s] and Mr. A[t]kins['s] testimonies would be based on the information Defendant initially gave them about the knife's location, Defendant would have to testify and lay the foundation that he did provide such information and what that information was. Even if Defendant testified, neither of the knife search witnesses found anything, so any hypothesis about why they did not find it would be speculation. As they did not find anything, their ability to support the self-defense theory is not of such an impact that it was reasonably probable that their testimony would have changed the outcome of the proceeding. Defendant has failed to show prejudice regarding these two witnesses.

Dr. Goldberger's testimony was excluded after proffer because there was not enough evidence in the record to support his opinion testimony. The doctor had no information that the victim was an addict, or that he was suffering from withdrawal at the time of the murder. His opinion testimony then would be entirely speculation based on a hypothetical situation without any knowledge of the actual events that transpired. The Court advised the attorneys that in order for Dr. Goldberger's testimony regarding possible drug addiction or withdrawal to be admissible, there must have been substantive evidence regarding drug use, but all that was in evidence was discussion that he took one pill which was within therapeutic range. There were no facts in evidence that the victim was a drug addict, in withdrawal, or that he was seeking pills to somehow help his cravings.

In order to overcome this barrier, Defendant's proposed testimony would need to show that he knew or suspected that the victim was in withdrawal in order for Dr. Goldberger's testimony to have any relevance. Defendant did not know the victim except that he met him once briefly and sold him some drugs. Even if counsel had advised Defendant to testify, Defendant could not testify as to the victim's drug addiction or withdrawal because he did not have any knowledge of that. Defendant's proposed testimony, which was already

known to the Court through law enforcement, does not include any information about the victim's purported drug addict condition. There is no evidence that, even with Defendant's proposed testimony, the Court would have permitted Dr. Goldberger's testimony. Defendant has failed to show any prejudice from defense counsel's failure to introduce Dr. Goldberger's proposed testimony, and thus, counsel cannot be found ineffective for advising Defendant not to testify.

Additionally, when the Court made its final decision to exclude testimony, Defendant was thoroughly advised on the matter. The Court explained to Defendant that his testimony was "part of the equation for the court ruling on admissibility of the doctor's testimony." Defendant admitted that before entering the courtroom he conferred with counsel twice about testifying. Defendant took responsibility for his decision, stating "I made the decision and [the attorneys] were informed by me. We discussed this." The Court asked Defendant repeatedly if he wanted to testify, and he consistently said no. He conferred with counsel to ensure the issue was preserved for the record. The Court advised Defendant at the very beginning of the trial to let his attorneys know anytime he needed a break to speak to them if he was confused or didn't understand something. The Court specifically advised Defendant that his testimony was needed to "potentially" get the other witnesses' testimony in, and he still refused. His decision not to testify impacted three total defense witnesses. He was aware of that when he discussed the matter with his attorneys. Defendant knew that the testimony would not come in unless there was some other way to put evidence on to lay the foundation for those witnesses. After all of the potential evidence was ruled on, the Court gave Defendant one more opportunity to change his mind or discuss the matter with his attorneys, and he refused to testify. Defendant, however, claims that while it was his decision, it was based on bad advice from his attorneys.

Defendant further claims that his testimony would have contradicted another State's witness (Defendant's sister), and if the jury believed him over her, then there is a reasonable probability the outcome would have been different. Defendant's story was already in evidence through the law enforcement recording. The only new information the jury would have learned from his proposed testimony was that he lied because he was afraid, which is the same reason Defendant's sister gave for her own lies. Defendant concedes later in his sworn motion that "during this interview it was obvious to the jury that the Defendant, out of fear, told two stories . . . which in turn killed the Defendant's credibility." If the jury already knew that Defendant was afraid, his testimony on the issue was not necessary nor would it have created a reasonable probability that the outcome of the proceeding would have been different. Additionally, the jury was well aware of Defendant's sister's inconsistent statements and incentive to testify. Despite knowing all that,

they still chose to convict Defendant.

> In order to establish ineffective assistance of counsel, Defendant must show both that his counsel was deficient and, assuming the first prong is met, that there was a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Spera*, 971 So. 2d at 757-58. Based on Defendant's proposed testimony, there is no reasonable probability that the result of the proceeding would have been different if Defendant had been advised to testify, as he now proposes, consistently with his statement to law enforcement.

(Doc. 12, Ex. 16, pp. 4-8) (court's footnotes omitted) (emphasis in original).

The record supports the denial of Miller's claim. Miller has not shown that he could have given testimony about Hickey's alleged addiction and withdrawal that was necessary to lay the foundation for Dr. Goldberger's testimony. As the state court's order notes, Miller told police that he thought the situation was "shady" based on Hickey's seeking pills in the middle of the night. (Doc. 12, Ex. 1d, p. 488). However, the evidence presented at trial indicates that Miller had only met Hickey once, and Miller has not shown that he knew the extent of Hickey's drug use or whether Hickey was experiencing withdrawal when Miller picked him up. (Doc. 12, Ex. 1e, pp. 625-26). Further, Miller does not establish that Springer and Atkins could have testified to why Springer was unable to locate a knife. Accordingly, he fails to show any reasonable probability that Springer's and Atkins's speculative testimonies would have changed the outcome of trial. In regard to these three witnesses, therefore, Miller does not show prejudice resulting from counsel's alleged deficient performance in advising him not to testify.

Finally, although Miller could have testified to a different version of events than Alicia, the jury was aware of his version through the introduction of his lengthy statement to police in which he claimed the gun accidentally discharged during a struggle with Hickey.

(Doc. 12, Ex. 1d, pp. 487-90, 495-96, 506). Miller fails to show a reasonable probability that the outcome would have been different had explained to the jury that he initially denied involvement in his statement to police because he was scared. Furthermore, Alicia admitted at trial that she had told different stories and had initially lied to the police. (Doc. 12, Ex. 1e, pp. 589-91). Counsel elicited her testimony that she had changed her story and that her last three statements were true "so that [she] could get a reduced sentence." (Doc. 12, Ex. 1e, pp. 621-23). Considering that the jury was aware of Alicia's inconsistent statements and her motive to testify, as well as Miller's own version of events, Miller does not show that he was prejudiced as a result of counsel's misadvice not to testify to his version of events.

The state court's decision did not involve an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of fact. Accordingly, Miller is not entitled to relief on Ground Three.[2]

Ground Four

Miller contends that trial counsel was ineffective in failing to move to suppress his post-*Miranda*[3] statements on the basis that detectives questioned him after he said that he did not understand his rights. The state court denied his claim:

Defendant alleges his confession was involuntary and should have been

---

[2] Miller claims in his reply that the state court erred in not conducting an evidentiary hearing on this claim. Miller cannot bring a new claim in his reply. *See Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008) ("We do not address arguments raised for the first time in a *pro se* litigant's reply brief. *Lovett v. Ray*, 327 F.3d 1181, 1183 (11th Cir. 2003). Timson, thus, has abandoned this issue."). Further, his claim is not cognizable in this federal habeas proceeding. *See Anderson v. Sec'y, Dep't of Corr.*, 462 F.3d 1319, 1330 (11th Cir. 2006) ("[T]he state court's failure to hold an evidentiary hearing on a petitioner's 3.850 motion is not a basis for federal habeas relief.").

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

suppressed.  Defendant alleges he did not understand his rights and he was suffering from withdrawal symptoms because he told the Detective he was "dope sick" at the end of their conversation.  The Detective who took Defendant's statements testified Defendant did not appear to be under the influence of drugs or alcohol at the time of the interview.  The Detective further testified that he did not believe there was anything wrong with Defendant based on his experience dealing with drug users.  The Court, jury, and both of Defendant's trial counsel were all able to see and hear Defendant in this video recording during discovery and at trial.  They would be best suited to interpret Defendant's statements and determine whether Defendant appeared confused or sick.  There is also no indication from the recording that Defendant did not understand his rights.  The relevant portion of the recording played at trial is as follows:

| Detective: | Before we go any further, you have rights.  And because you're in custody right now, I'm going to tell you your rights. |
| --- | --- |
| Defendant: | All right. |
| Detective: | I'm going to advise them, and I'm going to read them right off of this form.  These are called your Miranda rights. |
| Defendant: | Okay. |
| Detective: | I don't know if you've ever heard them before. |
| Defendant: | Yeah. |

. . .[4]

| Detective: | Do you understand those rights?  Do you need to read these? |
| --- | --- |
| Defendant: | No, sir. |
| Detective: | Okay.  All I need you to do is sign it right here.  This isn't an admission.  This doesn't mean anything.  This just says I read these to you. |

---

[4] The portion of the transcript omitted by the postconviction court's order reflects that Detective LeFebvre asked Miller to listen while he read from the rights advisement form, and then read *Miranda* warnings to Miller.  (Doc. 12, Ex. 1d, p. 445).

> Okay. And I'm going to note the time for the
> record . . .

> Based on the transcript, Defendant was aware of his rights. He heard them before. When asked an admittedly compound question regarding whether he understood his rights or needed to read them, he replied, "No, sir." Defendant argues he was saying no, as in, he did not understand his rights. However, Defendant did not make any other statements during the recording to indicate he did not understand those rights, nor did he ask any questions about his rights. A defendant bears the burden to overcome the strong presumption that trial counsel's performance was not ineffective. *McCoy v. State*, 113 So. 3d 701, 707 (Fla. 2013). Counsel had no obligation to move to suppress a post-*Miranda* statement which appeared to be given freely and voluntarily. The Court cannot deem trial counsel ineffective for failing to pursue a meritless issue. *Tefteller v. Dugger*, 734 So. 2d 1009, 1020 (Fla. 1999). Therefore, this ground is denied.

(Doc. 12, Ex. 16, pp. 9-10) (court's footnotes omitted).

Miller has failed to show that the state court's decision was objectively unreasonable. A waiver of the right to remain silent "must be . . . 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Whether a person who waives his *Miranda* rights has "the requisite level of comprehension" depends on the "totality of the circumstances surrounding the interrogation." *Burbine*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 422 U.S. 707, 725 (1979)).

The transcript does not show that Miller lacked an understanding of the rights he was waiving. Rather, it appears to show that Miller said, after conveying his familiarity with *Miranda* and being read his rights, that he did not need to read the rights advisement form. And as the state court noted, Miller made no statements during the interview indicating he did not understand his rights, nor did he ask any questions about his rights. (Doc. 12, Ex.

1d, pp. 443-91, 494-508, 510-520). Accordingly, he has not demonstrated that counsel performed deficiently in failing to move to suppress his statements. *See Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance.").

Because Miller fails to show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim, he is not entitled to relief on Ground Four.

Grounds Five and Eight

Miller argues that trial counsel was ineffective in failing to object to the prosecutor's improper comments during closing arguments. Closing argument is designed to "assist the jury in analyzing, evaluating and applying the evidence." *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984). While he may not go beyond the evidence presented to the jury, the prosecutor is not limited to a bare recitation of the facts. As the state court noted, a prosecutor may comment on the evidence and express the conclusions he contends the jury should draw from the evidence. *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984). *See also McArthur v. State*, 801 So.2d 1037, 1040 (Fla. 5th DCA 2001) ("The courts generally allow wide latitude in closing arguments by permitting counsel to advance all legitimate arguments and draw logical inferences from the evidence.").

An improper prosecutorial comment will warrant reversal only if it prejudices a defendant's substantial rights. *Sexton v. Howard*, 55 F.3d 1557, 1559 (11th Cir. 1995). A defendant's substantial rights "are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome [of the trial] would be different." *United States v. Hall*, 47 F.3d 1091, 1098 (11th Cir. 1995) (citing *Kennedy v. Dugger*, 933 F.2d 905, 914

(11th Cir. 1991)).  A reviewing court must evaluate an allegedly improper comment in the context of the whole trial because "[c]laims of prosecutorial misconduct are fact specific inquiries which must be conducted against the backdrop of the entire record."  *Hall*, 47 F.3d at 1098.

First, Miller claims that the prosecutor improperly argued that the jury should reject the lesser charge of second degree murder because Miller's taking a gun when he picked up Hickey established the premeditation necessary to prove first degree murder.[5]  Miller asserts that the prosecutor misstated the law.  The prosecutor argued:

> The defendant took a gun to a drug deal - - at least Joseph Hickey believed that it was going to be a drug deal.  Why did Wayne[6] Miller take that gun?  There is only one reason, because he intended to kill Joseph Hickey.
> . . .
> So the choice of weapon, it's hard to imagine a more lethal, a more dangerous, a more deadly weapon than a gun.  That in and of itself, taking that gun, shows premeditation and intent.
> . . .
>
> I submit to you that there was a clear intent and clear premeditation.  Why doesn't second degree murder apply in this case?  Because you would have to ignore that the defendant took the gun with him in that van.  You would have to ignore the fact that Alicia Miller and Wayne Miller discussed at length for hours killing Joseph Hickey.

(Doc. 12, Ex. 1f, pp. 855-56, 862).

Second, Miller asserts that the prosecutor's argument that the victim was shot in the head immediately upon entering the vehicle was unsupported by the evidence. He claims that no evidence showed that Hickey was shot immediately, or that the first shot hit him in the head. The prosecutor said:

---

[5] *See* § 782.04(1)(a)1., Fla. Stat.

[6] The trial transcript shows that Miller went by Wayne, his middle name.

Joseph Hickey never stood a chance after he got into that van.  He was shot almost immediately after climbing into that van through that rear passenger door.

. . .

The first shot to Joseph Hickey was a kill shot.  Alicia Miller's testimony, she sat up here and she told you that the shot was almost immediate.  As soon as Joseph Hickey got into that van, the two men may have greeted each other, but almost immediately Joseph Hickey was shot in the head.  Almost immediately.

(*Id.*, pp. 851, 856-57).

The state court denied Miller's claim of ineffective assistance:

Defendant's counsel is allegedly ineffective for failing to object to the State's closing argument when it made statements purportedly not supported by evidence.  In order to prevail on an ineffective assistance of counsel claim related to improper closing remarks, Defendant "must first show that the comments were improper or objectionable and that there was no tactical reason for failing to object."  *Stephens v. State*, 975 So. 2d 405, 420 (Fla. 2007).  Second, he must demonstrate prejudice.

First, the State argued that the reason Defendant took a gun with him to the crime scene is because he was intending to kill the victim.  There is evidence to support this inference from the trial testimony of Defendant's sister.  Next, the State argued that the victim was shot almost immediately upon entering the van.  There was testimony to support the State's claims that the victim was shot almost immediately and that he was shot in the head. . .

Defendant fails to show that the comments were improper and that counsel should have objected.  As a result, he fails to meet the requirements of *Stephens*. This ground is denied.

. . .

Defendant next argues that the State's closing argument regarding why second degree murder did not apply and whether premeditation was necessary for first degree murder was erroneous.  The Court advises the jury on the law, not the State.  Any prejudice that may have been created by the State's alleged erroneous legal argument was cured when the Court instructed the jury that the State's arguments were not the law and further when it gave the law in the form of jury instructions.  *See Freeman v. State*, 761 So.2d 1055, 1071 (Fla. 2000) (noting that standard jury instructions are presumed to be correct).

Defendant further argues that the State's erroneous legal argument caused the jury to disbelieve his defense. He points to various testimony which allegedly supports his defense. The jury, as the trier of fact, determines how much weight to afford a witness's testimony and all other evidence. As a result, this argument fails the second prong of the *Strickland* test and is denied. *See, e.g., Brown v. State*, 846 So.2d 1114 (Fla. 2003).

(Doc. 12, Ex. 16, pp. 15-16) (court's footnotes omitted).

The record supports the state court's conclusion that counsel was not ineffective in failing to object to the prosecutor's statements. First, Miller fails to show that the prosecutor improperly argued that Miller's possession of gun went to establishing premeditation, or that he was prejudiced by any incorrect statement of the law on first and second degree murder. Alicia testified that she and Miller discussed the possibility of shooting Hickey:

Q. When Wayne told you something could go wrong, somebody could get shot, you didn't care?

A. No, I did not. I'm the one who said to - - as far as I was concerned, he can go ahead and shoot him.

Q. Shoot him anyway, regardless?

A. Correct.

Q. Witness elimination.

A. Make it easier.

Q. Easier to rob somebody if they're dead?

A. Correct.

Q. And you suggested that to Wayne?

A. Yes, I did.

(Doc. 12, Ex. 1e, p. 635).

Accordingly, Miller fails to show that the prosecutor's argument–that Hickey's taking

a gun with him indicated premeditation–involved anything other than a reasonable inference that the jury could draw from the evidence. And to the extent he claims that counsel should have objected because the prosecutor misstated the law, Hickey does not show prejudice as a result of counsel's performance. The trial court instructed the jury that it was to follow the law as set out in the jury instructions, and instructed the jury on the elements of first degree murder and second degree murder. (Doc. 12, Ex. 1f, pp. 903-05, 907-09, 925). Jurors are presumed to follow the court's instructions. *Brown v. Jones*, 255 F.3d 1273, 1280 (11th Cir. 2001) ("We have stated in numerous cases . . . that jurors are presumed to follow the court's instructions."); *Raulerson v. Wainwright*, 753 F.2d 869, 876 (11th Cir. 1985) ("Jurors are presumed to follow the law as they are instructed.").

Nor does Miller show that the prosecutor improperly commented that Hickey was immediately shot in the head. The State presented evidence that Hickey was shot very shortly after entering the van. Alicia testified:

Q. Tell the [ ]jury what happened when Joseph got into that van?

A. I started to drive away. He got in, him and Wayne greeted each other, and then very quickly after that, Wayne shot him.

Q. When you say they greeted each other, what do you mean by that?

A. Just a, Hi, how is it going?

Q. How much time elapsed between Joseph Hickey getting into that van and Wayne pulling the trigger of that gun?

A. I don't remember precisely. It was not much.

Q. Was it immediate?

A. Pretty much? Pretty quickly, yes. Pretty immediate.

(Doc. 12, Ex. 1e, pp. 606-07).

She again stated, later in her testimony, that Miller shot Hickey almost immediately after Hickey got in the van.  (*Id.*, p. 644).   And the prosecutor's assertion that this immediate shot struck Hickey in the head was based on 1) Alicia's testimony that Miller, sitting in the front passenger's seat, turned towards the center of the van and fired one shot, and 2) the medical examiner's testimony describing the location and characteristics of Hickey's fatal head wound.  Alicia testified:

Q.  Did Wayne ever leave the passenger seat of that van?

A.  No, ma'am.
. . .

Q.  It would be inescapable for you not to see Wayne leaving that passenger seat if he did so?

A.  Correct.
 . . .

Q.  Are you able to show us from where you're sitting exactly how Wayne shot Joseph?  Can you show us?

A.  I don't really - - I didn't really see because I was driving.  He never left the seat.   He just sort of turned to the center. . . .  He just turned like this (indicating).  It was just a turn.

Q.  Just a turn and a shot?

A.  Yes, ma'am.

(*Id.*, pp. 607-08).

The medical examiner, Dr. Wilson A. Broussard, Jr., testified about Hickey's fatal head wound and the spatter on a door in the van:

A.  [State's Exhibit 57 depicts] the fatal gunshot wound to the right side of the head. . . . And it's kind of elongate[d] and irregularly shaped because of the angle at which this bullet hits kind of the side of the head rather than hitting direct on.
. . .

[T]he bullet basically entered in this vicinity behind the frontal bone and the parietal bone area. And because of the angle, it was a little bit . . .elongated, and it penetrated into the cranial cavity and exited before getting out to the right side of the midline, so a little bit of a very slightly downward angle, something like entrance here, exit about here.

Q. Okay. So there was slightly a downward angle?

A. Very slightly, yes.

Q. Okay. Now, would that injury almost be instantly incapacitating?

A. Yes. . .
. . .

Q. Okay, so the injury would be consistent with the victim relatively upright near that cargo door on the right-hand side.

A. Correct. I couldn't see an explanation for having that kind of pattern [of spatter with brain material] if he was shot lying down - -

Q. Okay.

A. - - or from the back of the van or something - -

Q. Not on the floor of the van or anything like that.

A. Not consistent with that, no.

(Doc. 12, Ex. 1e, pp. 689-90, 694-95, 705).

The prosecutor's assertion that Hickey was immediately shot in the head derived from this testimony. The prosecutor expanded on his argument that Hickey was immediately shot in the head by stating:

Dr. Broussard's testimony, head-shot was slightly downward. And use your common sense and your logic. Joseph Hickey is climbing into the back of a van. He gets up on the step, and he's crunching over, getting in pulling the door closed behind him, his head is right there, pow, shot right in the head immediately after he gets in the van. Dr. Broussard testified that Joseph Hickey's blood and brain matter were on that passenger door, splattered on the door that he had just entered. The autopsy photo is consistent with Alicia's testimony and with Dr. Broussard's testimony.

(Doc. 12, Ex. 1f, p. 857).

Miller fails to demonstrate that the prosecutor made an improper comment, rather than a permissible comment that involved a reasonable inference from the evidence. Accordingly, he has not demonstrated that counsel was ineffective in failing to object to the prosecutor's comments. Miller has not shown that the state court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable determination of fact. He is not entitled to relief on Ground Five or Ground Eight.

Ground Six

Miller argues that trial counsel was ineffective in failing to object to the exclusion of medical records that supported his theory of defense. He explains:

> The State's theory was that the defendant's motive for the crime was to obtain money to purchase prescription pills. The records in question would show that the defendant had only a day or two prior to the shooting, legally obtained two different prescription pain medications. That record was critical in supporting the theory of defense as well as a rebuttal to the theory of the State.

(Doc. 1, p. 14).

The state court denied this claim:

> Defendant next argues that this counsel failed to object to the exclusion of his medication records from evidence. Defendant has medication records showing he picked up his pills on April 13, 2010, and therefore had them in his possession to sell to the victim in the early morning of April 16, 2010. Defendant asserts that his counsel attempted to enter these records into evidence, the State objected, and counsel agreed with the State. Defendant does not point to the record where this happened. However, upon review of the entire record, the Court notes that the State objected to the records as irrelevant in its Pre-Trial Motion in Limine and withdrew its objection prior to the Court's order on the motion.
>
> Defendant fails to show how these records would have changed the outcome of the proceeding. There was testimony to support the fact that Defendant had filled a prescription for the drugs. There was also testimony that those

drugs were used up prior to the murder. The paper document showing the medication fill date and amounts would not show that he still had pills in his possession to sell days later. As Defendant did not show specifically in the record where counsel failed to object, and also fails to show prejudice even if an error were made, this ground is denied.

(Doc. 12, Ex. 16, p. 17) (court's footnotes omitted).

Detective LeFebvre testified that he was aware Miller had a doctor's appointment on April 13, and that Miller had prescriptions for Roxicodone and Oxycontin. (Doc. 12, Ex. 1d, p. 548). Alicia stated that Miller obtained about 200 pills on either April 13 or April 14, but that they were almost out of pills by the time they decided to rob Hickey. (Doc. 12, Ex. 1e, pp. 624-25). She testified:

> Q. Alicia, on Tuesday when Wayne got those 200-odd pills until Friday, what happened to hose pills?
>
> A. He used them - - well, other than he owed some out. He may have sold some. I don't believe so. I believe he owed them out, and then there were four adults using drugs in the home at that time. So they were used.
>
> Q. Let's talk about what you mean by the statement, "He owed some out." What does that mean?
>
> A. When we would run out of pills, usually rather than buying them, because while I sold them, I did not buy them very often. More often I would borrow them from other people who I knew went to the doctor and then just pay them back what I had borrowed them.

(*Id.*, pp. 641-42).

Alicia reiterated that "between what was owed out and what was used" the pills were gone by the time she and Miller decided to rob Hickey. (*Id.*, p. 644). Considering this evidence, as the state court found, Miller fails to show that any records confirming he obtained pills through a prescription in the days before Hickey's death would demonstrate "that he still had pills in his possession to sell days later." Accordingly, he has not

established that counsel was ineffective in failing to object to the exclusion of such records. Miller has not shown that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim. He is not entitled to relief on Ground Six.

Ground Seven

Miller argues that trial counsel was ineffective in failing to properly impeach prosecution witness Cheyenne Ewing with her prior inconsistent statements. Ewing was Hickey's girlfriend. She testified at trial that Hickey "sometimes" used pain pills, and had last taken a pill on the morning of April 15. (Doc. 12, Ex. 1c, pp. 339, 343). Miller contends that at her deposition, however, Ewing testified that Hickey did not use pain pills. He argues that Ewing's trial testimony that Hickey used pills occasionally was critical evidence for the State to disprove his theory that Hickey consistently used pills and acted aggressively towards Miller because he was experiencing withdrawal. Therefore, he contends, counsel needed to impeach Ewing's credibility. The state court denied this claim:

> Defendant argues that counsel failed to impeach Cheyenne Ewing. Ms. Ewing testified in a deposition that the victim did not use pills at the time of the murder because his mother didn't like it, but in Court she testified that the victim used pills on the weekend with her sometimes and he had used one the morning he died. Defense counsel unsuccessfully attempted to impeach Ms. Ewing with her inconsistent statements. Ultimately, defense counsel did not continue with the impeachment attempts. Defendant alleges in his motion that Ms. Ewing's inconsistent testimony shows that the victim's pill use was more substantial than indicated by the State, up to the point of addiction.
>
> Defendant fails to show that proper impeachment on this point would have been reasonably likely to change the outcome of the proceeding. The witness was not present at the murder and her testimony is not dispositive of the case. Considering the amount of evidence against Defendant otherwise (including his own statements to law enforcement and his sister's testimony), there is no reasonable probability that proper impeachment of this witness would have changed the outcome of the proceeding. This ground is denied.

(Doc. 12, Ex. 16, pp. 18-19) (court's footnotes omitted).

As the state court's order described, counsel tried to impeach Ewing with her prior statement, but abandoned this attempt upon the prosecution's multiple objections. (Doc. 12, Ex. 1c, pp. 349-54). Even assuming deficient performance, however, Miller fails to show prejudice. Initially, Miller's defense did not rely on the argument that Hickey's alleged withdrawal caused him to be aggressive because, as discussed in Ground Three, *supra*, there was no evidence to support the presentation of the withdrawal theory.[7] Moreover, considering the State's evidence of guilt, including Alicia's testimony about the shooting, Miller does not show a reasonable probability that impeaching Ewing with her prior statement would have resulted in a different outcome. Accordingly, Miller does not show that the state court unreasonably applied *Strickland*'s prejudice prong or unreasonably determined the facts in denying his claim. He is not entitled to relief on Ground Seven.

Accordingly, it is **ORDERED** that Miller's petition (Doc. 1) is **DENIED**. The Clerk is directed to enter judgment against Miller and to close this case.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL *IN FORMA PAUPERIS* DENIED

It is **ORDERED** that Miller is not entitled to a certificate of appealability (COA). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a COA. *Id.* "A [COA] may issue . . . only if the applicant has made a substantial

---

[7] In closing argument, counsel presented a self-defense theory, contending that 1) Alicia's testimony was the only evidence contradicting Miller's version of events but her testimony was not reliable and 2) the physical evidence did not rule out a struggle as Miller described. (Doc. 12, Ex. 1f, pp. 867, 869-70, 873-74, 876, 880-81, 884-86).

showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Miller "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Miller has not made the requisite showing in these circumstances. Finally, because Miller is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

**ORDERED** at Tampa, Florida, on June 28, 2018.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Reilies Wayne Miller
Counsel Of Record